Anthony Oliver., Plaintiff Pro Se
1 Verano Lake Drive
Savannah, Georgia 31322
(912) 220-5842 (Telephone)
(818) 855-1101 (Facsimile)
Anthony.oliver29@rocketmail.com

*Plaintiff Appearing Pro Se*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTHONY OLIVER, <br><br> Plaintiff, <br><br> vs. <br><br> JAMIE MICHELLE LUNER; SPELLING TELEVISION, Inc., Unknown Corporation; DARREN STARR PRODUCTIONS, Inc., a California Corporation; and DOES 1-10 inclusive. <br><br> Defendants. | Case No: CV-18-02562-VAP-(AFMx) <br> _____ <br> Honorable Virginia A. Phillips <br> United States District Judge Chief Judge <br><br> PLAINTIFFS FIRST AMENDED COMPLAINT FOR DAMAGES |

# FIRST AMENDED COMPLAINT FOR DAMAGES

Plaintiff, Anthony Oliver (Hereinafter "Plaintiff"), appearing pro se, hereby sues the Defendants, Jamie Michelle Luner, Spelling Television, Inc., and Darren Star Productions, Inc., (Hereinafter "Defendants"), and alleges the following:

## PARTIES

1. This is an action for damages in excess of the sum of Seventy-five Thousand ($75,000.00) Dollars, exclusive of costs, interest and attorney's fees.

2. At all times material hereto, the Plaintiff, Anthony Oliver was a resident of Los Angeles, in Los Angeles County, California, and was a minor at the age of 16 years old when the allegations took place.

3. At all times material hereto, the Defendant Jamie Luner or Defendant was and still is a resident of Los Angeles County, State of California, and was at the time of the allegations residing at 3823 Eureka Drive, Studio City, California 91604.

4. At all times relevant, the Defendant Spelling Television, Inc., ("STI") is a Delaware Corporation doing business in California and can be served through their agent for service of process Corporation Service Company located at 2710 Gateway Oaks Drive, # 150N, Sacramento, California 95833.

5. At all times relevant, the Defendant Darren Star Productions, Inc., ("DSP") is a California Corporation doing business in California and can be served through their agent for service of process Grant & Tani, Inc., located at 9100 Wilshire Blvd, # 1000W, Beverly Hills, California 90210.

/ / /
/ / /
/ / /

## JURISDICTION AND VENUE

6. Jurisdiction in this court is proper based on 28 U.S.C. § 1332 because Plaintiff, is a citizen of the State of Georgia and Defendant, is a citizen of California and the damages are in excess of $75,000.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

8. Defendant Jamie Luner is professional actress and known throughout the world for her star performance as actress "Lexi" on the hit television show called Melrose Place. There, the Defendant rose to fame at show aired for years on television.

9. In addition to her television show appearances, Defendant starred in numerous motion picture films and other unknown television shows for the past 20 years.

10. Upon information and belief, Plaintiff learned from members of the Los Angeles Police Department, ("LAPD"), that various young men came forward and complained about different sexual assault allegations which date back to her begging of the television show Melrose Place.

11. To date, two other men have come forward and accused the Defendant of various different types of sexual assaults that included drug induced sexual assaults.

12. After the Defendants career took off, she made millions of dollars and the world was in the palm of her hand. During the highlight of her career, Defendant hired her own personal make-up artist Phillip Pico, ("PICO"), who in turn, traveled with her every step of the way.

13. In early 1998, while living in Studio City, PICO later became friends with Plaintiffs brother. Mr. Pico later confided in Plaintiffs brother by informing

him that Mr. PICO was an openly gay male. After striking up a friendship with the Plaintiffs brother, PICO then later met Plaintiff who became in love with Plaintiff due to his young looks and physique.

14. In the summer of 1998, PICO was tending to the Defendants hair and make up needs when the Defendant was starring on Melrose Place. It was then that the Defendant and PICO decided to hold a house party due to the highlights of the show Melrose Place. Ratings where at its all time high. With the number one show on television.

15. After the Defendant and PICO decided to hold a house party at the Defendants' home in Studio City, PICO told the Defendant about the Plaintiff and both the Defendant and PICO insisted that Plaintiffs brother bring Plaintiff to the Defendants' home for a party.

16. Sometime in 1998, Plaintiff, his brother and several other men arrived at the home of the Defendant located at 3823 Eureka Drive, Studio City, California 91604.

17. The Plaintiff, his brother, several men and PICO later arrived via a limousine that the Defendant sent for everyone. As the party began and the guests arrived, Plaintiffs brother and his friends left the home after leaving Plaintiff at the home with PICO and the Defendant. At the instruction of the Defendant and Mr. PICO, Plaintiffs brother was told not to come back until several hours later.

18. After Plaintiffs arrival, Mr. PICO would later introduce Plaintiff to the Defendant. In fact, while Plaintiff was sitting on the Defendants' couch, the Defendant came out of her bedroom and introduced herself and replied; "you are so adorable."

19. The Defendant then asked Plaintiff if he would like a drink and the Plaintiff replied; "I'm only 16 and not there yet."

20. Despite knowing that Plaintiff was a minor, the Defendant instructed Mr. PICO to go into her kitchen and fix Plaintiff a Jack Daniels whiskey and coke.

-4-
FIRST AMENDED COMPLAINT FOR DAMAGES

21. As Plaintiff was getting acquainted with the Defendant, Mr. PICO then returned to the living room area where Plaintiff and Defendant were sitting.

22. Mr. PICO then handed the drink to the Defendant who in turn stated; "this is from me to you."

23. The Defendant then reached over and handed the drink to the Plaintiff and Plaintiff if he knew who he was sitting next to. Plaintiff replied that he had no clue as to who she was.

24. As the night was still early, the Defendant continued providing the Plaintiff with more Whiskey despite knowing that Plaintiff was only 16 years old.

25. After three hours of drinking and talking, the Defendant went to her master bedroom and removed a small plastic bag of crystal meth from her purse that was sitting on her bedroom dresser. Once the Defendant returned from her bedroom, the Defendant emptied the contents of the baggie onto a living room coffee table and asked Plaintiff if he ever used crystal meth and the Plaintiff said no.

26. After realizing for the very first time that the Plaintiff never drank any alcohol or narcotics, the Defendant saw her opportunity to take responsibility for giving the Plaintiff his first drink and drugs. After Plaintiff asked the Defendant what this drug was and what could happen if he took it, the Defendant replied by saying "its going to make you real horny."

27. However, Plaintiff insisted in not using the drugs and informed the Defendant and Mr. PICO that he wanted to leave. But the Defendant and Mr. PICO insisted that Plaintiff stay. The Defendant then took Mr. PICO to her bedroom and closed the door. Thereafter, Mr. PICO and the Defendant where heard talking for over 10 minutes. Plaintiff believes and thereon alleges that both Mr. PICO and the Defendant manifested a way for the Plaintiff to consume some of the drugs. After several minutes, they both returned and the Defendant offered $ 200.00 to the Plaintiff to consume the drugs. Plaintiff again rejected the offer by the Defendant

-5-
FIRST AMENDED COMPLAINT FOR DAMAGES

1  and told both Mr. PICO and the Defendant that Plaintiff consumed a lot of whiskey
2  and just wanted to take some Tylenol and lay down. Mr. PICO and the Defendant
3  then grabbed some tissue and laced the tissue with crystal meth and rolled it up to
4  make it look like Tylenol. Mr. PICO and the Defendant then provided it to the
5  Plaintiff and the Defendant said to take these "two Tylenols" and "call me in the
6  morning."

7      28.     With Plaintiff not in his right state of mind, Plaintiff took a drink of
8  water and the two alleged Tylenols and swallowed them. Within minutes, the
9  Plaintiff began spinning and became sexually aroused.

10     29.     At one point, Plaintiff began to have a large erection and began to
11 become sexually aroused. Both Mr. PICO and the Defendant then walked into the
12 room and began laughing. Both parties asked Plaintiff if he "horny" and he replied;
13 "ah yes."

14     30.     As the time went by, Mr. PICO insisted that the Defendant go to her
15 room and put on her adult "kitty cat" adult outfit. The Defendant then went to her
16 room and put on the adult outfit equipped with fish nets, high heels, cat ears and a
17 whip.

18     31.     Plaintiff was then escorted by the Defendant and sat down on the
19 couch. Once sat down, both the Defendant and Mr. PICO then put more crystal
20 meth on the table and snorted the drugs using a rolled-up dollar bill. Plaintiff
21 watched both the Defendant and Mr. PICO consume the drugs.

22     32.     Minutes later with drugs flowing in their systems, the Defendant and
23 Mr. PICO then began touching and caressing the Plaintiff. The Defendant then got
24 on top of the Plaintiff and began kissing him and insisted that the Plaintiff take his
25 shirt off. The Defendant began licking the Plaintiffs neck, chest and arms. Without
26 Plaintiffs consent coupled with being high on drugs combined with being drunk,
27 the Defendant and Mr. PICO began removing Plaintiffs pants belt, under pants and
28 his socks.

-6-
FIRST AMENDED COMPLAINT FOR DAMAGES

33. After sitting there completely nude, the Defendant said to Mr. PICO; "should we be doing this with him being 16 years old, I'm 26 and we only live once, so let's do it."

34. Understanding that Plaintiff was a minor, the Defendant and Mr. PICO stood Plaintiff up and the Defendant began performing oral sex and placing Plaintiffs testicles in her mouth. With Plaintiff having an erection, the Defendant took the Plaintiffs penis out of her mouth and placed it in Mr. PICO's mouth who also began performing oral sex on the Plaintiff. At all times relevant, the Defendant and Mr. PICO knew and had reason to know that Plaintiff was a minor and was violating California state law but decided to do it anyways.

35. The Defendant and Mr. PICO then sat Plaintiff back down on the couch and the Defendant got on top of Plaintiff and stated; "are you ready to get your d___ wet."

36. Plaintiff immediately informed the Defendant that Plaintiff never had intercourse with a woman, and the Defendant then displayed the biggest smile as person could have. The Defendant then got on top of the Plaintiff and sat down on top of Plaintiffs penis and engaged in sex with the Plaintiff. While the Defendant was on top of the Plaintiff, Mr. PICO removed the Plaintiffs penis from her vagina and began performing oral sex and then placed Plaintiffs penis back inside of the Defendant. Approximately ten minutes later, Plaintiff ejaculated inside of the Defendant. In turn, the Defendant got off of the Plaintiff and asked "how was it."

37. The Defendant and Mr. PICO insisted that Plaintiff have sex with Mr. PICO. Plaintiff adamantly declined and said no. The Defendant insisted that all of the parties consume more crystal meth. the Defendant and Mr. PICO provided more crystal meth to the Plaintiff. After consuming more drugs, the Defendant then insisted the Plaintiff have sex with her again. In fact, the Defendant removed her kitty cat outfit and took Plaintiffs hand and instructed Plaintiff to "come bend me over the couch and ram me."

-7-
FIRST AMENDED COMPLAINT FOR DAMAGES

38. Not withstanding again that Plaintiff was a minor, the Defendant and Mr. PICO insisted that Plaintiff penetrate the Defendant. Plaintiff again engaged in sex with the Defendant. Just as the Plaintiff and Defendant finished having sex again, Plaintiffs brother and friends had just returned from Hollywood and walked in the Defendants living room and began recording the sex between Plaintiff and the Defendant. The Defendant ran to her room after everyone arrived and took a shower. Plaintiffs brother examined the Plaintiff and discovered that Plaintiff was under the influence of drugs and alcohol. Plaintiffs brother asked Mr. PICO if he knew what was going on and Mr. PICO replied; "Jamie just took ur brothers virginity."

39. Enraged, Plaintiffs brother instructed Plaintiff to put his clothes back on and get ready to leave. The Defendant then came out to the living room and took Plaintiff into her master bedroom that was decorated with native American artifacts and provided Plaintiff with a shower towel and directed the Plaintiff to take a shower. The Defendant took Plaintiff to the shower and made sure to wash off any form of DNA. The Defendant provided Plaintiff with a wash cloth and instructed Plaintiff to "wash nuts and bolts."

40. Once Plaintiff showered, the Defendant and Plaintiff went into the living room and the Defendant asked Plaintiffs brother to leave Plaintiff with her at her home for a few days. When Plaintiffs brother refused, the Defendant offered Plaintiffs brother to leave him with her and he refused. The Defendant then insisted the Plaintiff and her take photos prior to leaving and they did so. The Defendant provided the photos to the Plaintiff despite the fact that to this point, the Plaintiff had no idea who the Defendant was, nor did Plaintiff ever watch Melrose Place.

41. Further, the Defendant insisted the Plaintiff leave the Defendant with a phone number. Plaintiff did so by leaving her with his mother's home phone number. As Plaintiff was leaving, the Defendant insisted one last time that Plaintiff stay for a few more days. Plaintiff later provided Defendant with the Plaintiffs

-8-
FIRST AMENDED COMPLAINT FOR DAMAGES

mothers home phone number. The following day after Plaintiff left the Defendant's home, called the telephone number given to her from the Plaintiff, and called and left a telephone voicemail on the Plaintiffs mothers voicemail stating that Defendant wanted Plaintiff to come back over to her home and stay for a week or two and that the Defendant "had a lot of fun" with the Plaintiff and that "you were great" was recorded. On February 21, 2018, Plaintiff was informed for the very first time about the existence of the recorded voicemail left by Defendant.

42. One week later, Plaintiff telephoned the Plaintiff and LUNER insisted that Plaintiff travel to Studio City to meet with LUNER for lunch. Plaintiff hopped on a local bus and traveled to Encino, California where LUNER met with Plaintiff at a restaurant in Studio City. There, Plaintiff and LUNER had lunch. Defendant LUNER insisted that Plaintiff come to her home for a few minutes so that LUNER could change her shoes. Plaintiff and LUNER then got into the Defendants white infinity. From there, Plaintiff and LUNER went to her home for a few minutes where Plaintiff remained on the living room couch. After a few minutes, Plaintiff and LUNER left her home. Once back in the Defendants car, LUNER insisted upon showing the Plaintiff the studio where the television show Melrose Place was filmed in Los Angeles.

43. After traveling a short distance, Plaintiff and LUNER arrived at the film studio owned and operated by Defendants Spelling Television Inc., ("STI") and Darren Star Productions, Inc., ("DSP").

44. Both Defendants STI and DSP where the exclusive corporations and companies that produced the hit show Melrose Place.

45. Defendant LUNER took Plaintiff to the Melrose Place film studios where the television show was filmed and produced by STI and DSP during the 1990's.

-9-
FIRST AMENDED COMPLAINT FOR DAMAGES

46. After arriving at the studios owned and operated by STI and DSP, Defendant LUNER showed Plaintiff various outfits that she wore on the set on the show. For instance, LUNER showed Plaintiff the same Kitty Cat outfit that she wore on the night she drugged and raped the Plaintiff.

47. After showing Plaintiff the television set, Plaintiff and LUNER sat and talked about the night she took Plaintiffs virginity.

48. Upon information and belief, Defendant LUNER was worried that the Plaintiff would tell his parents. In a conversation with the Plaintiff, the Defendant insisted that Plaintiff keep their sexual encounter a secret.

49. The same day, while alone, Defendant LUNER insisted that she and the Plaintiff engaged in oral sex while on the film set that belonged to STI and DSP.

50. Several minutes later, while acting within the scope of employment of STI and DSP, LUNER took provided Plaintiff with an alcoholic beverage located on the set of the television show. After an hour, Plaintiff began feeling dizzy and needed to lie down. The Defendant insisted that the Plaintiff lie down on the bed that was used to film parts of the Melrose Place show. Plaintiff laid down and LUNER insisted that Plaintiff take off his pants. LUNER forcibly took Plaintiffs pants off and performed oral sex on Plaintiff until ejaculation.

51. Shortly thereafter, Plaintiff was informed by LUNER that "this is our little secret."

52. Several hours later, Plaintiff and LUNER went back to her home in Studio City and LUNER insisted that Plaintiff spend the night at her house.

53. At all times relevant, Defendant LUNER and SPELLING were acting within scope of her employment with STI and DSP.

54. As Plaintiff grew up, he had to live with the memories of having sex with not only with Defendant LUNER but must also the memories, nightmares and embarrassment of having sex with a man as well. The Defendant clearly intended

to cause offensive contact and did in fact cause contact with various parts of Plaintiffs body. After all, the Defendant got self-gratification knowing that the Defendant was the first woman Plaintiff ever slept with, and consumed narcotics and alcohol with.

55. As a direct result of the damage caused by the Defendant, Plaintiff is left damaged mentally. In fact, Plaintiff is left not knowing if he is attracted to a man, woman, or both.

56. As a further and direct result of the actions of the Defendant, Plaintiff suffers from being an alcoholic. As years went by, Plaintiff consumed an enormous amount of alcohol. Plaintiff at one point had to check himself into an alcohol rehab inpatient program to try and overcome the nightmare that the Defendant and Mr. PICO orchestrated.

57. At all times relevant, Defendant knew and reason to know that the Plaintiff was a minor at the time of the sexual encounter with Plaintiff but carried out the misconduct anyways. At not time did Plaintiff consent to the actions and conduct committed by Defendant. In fact, Defendant knew that only to engage in sex with the Plaintiff was to load Plaintiff up with drugs and booze.

58. On February 19, 2018, Plaintiff obtained an airline ticket and flew to Los Angeles to meet with LAPD detectives from the LAPD North Hollywood station. There, Plaintiff met with veteran LAPD detective, Detective Jay Soares, ("SOARES"). The LAPD opened an investigation against Defendant and is ongoing. Upon information and belief, the LAPD has contacted the Defendant who declined to meet with Det. SOARES and the LAPD special victim's unit at the LAPD North Hollywood division. The Plaintiff was informed that the Defendant has multiple criminal four convictions for battery on LAPD Officers and domestic violence.

59. The actions and inactions of the Defendant were clearly intentional and with complete disregard for the rights of the Plaintiff thereby entitling the Plaintiff to an award of punitive damages pursuant to California Code of Civil Procedure § 3294.

## COUNT ONE

**(By Plaintiff for Sexual Battery Against Defendant)**

60. Plaintiff incorporates by reference as fully set forth in each of the paragraphs of this complaint.

61. The acts of the Defendant were intentionally performed to cause an offense of an unwanted touching and contact of an intimate and sexual nature against the Plaintiff.

62. Additionally, Defendants acts a providing alcohol and/or a foreign substance to the Plaintiff were malicious, fraudulent, deceitful and oppressive and perform to prevent Plaintiffs' consent. Because of the Defendants status as a celebrity in position of authority as an adult greater than Plaintiff's age and because of the Defendants acts of providing alcohol and foreign substance to Plaintiff, he did not consent nor get his meaningful consent to the aforementioned acts of the Defendant.

63. As a direct legal and proximate result of the acts of the Defendant, Plaintiff has sustained serious and permanent injuries to his person, all of his damage in an amount to be shown according to proof, and in the amount no less than the jurisdictional limits of this court.

64. As a direct legal and proximate result of the acts of the Defendant, Plaintiff was compelled to employ the assistance of medical or mental health professionals, facilities and services and Plaintiff is informed and believes and thereon alleges that Plaintiff will need to continue treatment in the future for an indefinite period and walk her additional damages to be shown according to proof.

65. Plaintiff is informed and believes in there on alleges that the acts by the Defendant against Plaintiff were carried out with a malicious and conscious disregard towards the Plaintiff and as such, constitutes oppression, fraud or malice pursuant to California Code of Civil Procedure 3294 entitling Plaintiff to an appropriate amount of punitive damages.

66. Plaintiff will provide the necessary certificates of merit pursuant to the code in his claims forthwith.

## COUNT TWO

**(By Plaintiff for Intentional Infliction Emotional Distress Against Defendant)**

67. Plaintiff incorporates by reference as fully set forth in each of the paragraphs of this complaint.

68. Defendant committed acts of providing alcohol and/or a foreign substance or drug and also touching and molesting Plaintiff were disgusting and despicable. Defendant touched and molested Plaintiff without the Plaintiffs consent. Defendant committed conduct that was so extreme, that it was beyond all bounds of decency tolerated by society.

69. Defendant knew or should have known that the Plaintiff was vulnerable because of his young age and the fact that he was forcibly and mentally incapacitated by the Defendant's act of providing the alcohol or substance causing Plaintiffs injuries. Defendant abused her position as a celebrity and her greater age and wisdom over Plaintiff and intentionally or recklessly knew or should have known these acts were outrageous and would cause severe harm to Plaintiff.

70. Because of the result of Defendant's knowing and intentional and outrageous acts against the Plaintiff, Plaintiff has suffered severe stress, enduring emotional harm and loss of income. The Defendant's action was reprehensible and were done in a malicious, deceitful, fraudulent and oppressive manner pursuant to California Code of Civil Procedure § 3294, thereby entitling Plaintiff to an award of punitive damages and set an example of the Defendant.

## COUNT THREE

**(By Plaintiff for Negligent Infliction of Emotional Distress Against Defendant)**

71. Plaintiff incorporates by reference as fully set forth in each of the paragraphs of this complaint.

72. Defendant had a duty to Plaintiff by inviting him to her home to make sure that no foreseeable harm would come to him at this event and/or house party or from conditions at the residence that Defendant owns at the aforementioned address.

73. Furthermore, Defendant had a legal duty to not engage in sex or molestation of a minor or to have non-consensual sex or molestation with an adult. Defendant had a duty to not provide alcohol or substances to minors or adults under age 21.

74. The Defendants action of inviting and hosting young and impressionable and possibly minor children to her residence and providing alcohol beverages and/or foreign substances was negligent at the very least. Additionally, the Defendants acts of providing alcohol and/or a foreign substance or drugs and also touching and molesting the Plaintiff were disgusting and very much so despicable. Defendant knew or should have known such conduct was likely to harm the Plaintiff.

75. As a direct and proximate result of Defendant inviting, inducing Plaintiff with alcohol and drugs, taking Plaintiff to a private bedroom and bathroom for the Plaintiff to be harmed, caused actual harm to the Plaintiff.

76. Defendant knew or should have known Plaintiff was and would be vulnerable because of his young age and the fact her negligence was likely to cause severe and enduring harm to the Plaintiff. At all times relevant, Defendant molested Plaintiff without his consent.

77. Because of the result of the Defendant's knowing and intentional and outrageous acts against Plaintiff, the Plaintiff has suffered and will continue to

suffer severe stress, enduring emotional harm and loss of income. All to Plaintiffs damage in an amount to be proven at trial, but not less than $ 250,000,000.00.

## COUNT FOUR
## (Respondeat Superior)
## (By Plaintiff Against All Defendants)

78. Plaintiff incorporates by reference as fully set forth in each of the paragraphs of this complaint.

79. Defendant STI and DSP are vicariously liable for all of the acts and omissions by Defendant LUNER. All abuse suffered by Plaintiff was during the course of her employment at STI and DSP and inflicted by Defendant LUNER during the course of Defendant's STI and DSP management and operation of the filming business. Defendants STI and DSP knew or reasonably should have known about all of sexual misconduct the conduct by Defendant LUNER.

80. Upon information and belief, Defendant STI and DSP knew of the sexual abuse and misconduct that LUNER committed on the Plaintiff and other unknown Plaintiffs.

81. At all times relevant, Defendant STI and DSP were the production companies that employed Defendant LUNER and gave the Defendant exclusive access to their filming and productions studios. Further, as such a master-servant relationship existed at all times relevant to the acts or omissions herein described.

82. The Defendant's action was reprehensible and were done in a malicious, deceitful, fraudulent and oppressive manner pursuant to California Code of Civil Procedure § 3294, thereby entitling Plaintiff to an award of punitive damages and set an example of the Defendant.

///
///
///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendant as more fully set forth below;

1. For an award of compensatory and financial damages in the amount of $ 250,000,000.00 from the Defendants jointly and severally;

2. For special damages, according to proof;

3. In addition to actual damages, statutory damages as allowed by law,

4. For costs of suit pursuant to Fed.R.Civ.P. 54(d), and 28 U.S.C. § 1920;

5. For an award of punitive damages against the Defendant pursuant to California Code of Civil Procedure § 3294;

6. Any and other further relief as this Court deems just and proper.

Respectfully submitted,

DATED: April 22, 2018.

By: /S/ Anthony Oliver

Anthony Oliver, Plaintiff Pro Se

/ / /

/ / /

/ / /

**JURY TRIAL DEMANDED**

Plaintiff is entitled to, and demands, a trial by jury pursuant to the Seventh Amendment to the United States Constitution.

Respectfully submitted,

DATED: April 22, 2018.

By: /S/ Anthony Oliver

Anthony Oliver, Plaintiff Pro Se